Kemal MEHINOVIC, et al., Plaintiffs,

v.

Nikola VUCKOVIC, a/k/a Nikola Nikolac, Defendant.

No. CIV.A.1:98–CV–2470–M.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 29, 2002.

As Amended May 2, 2002.

Jennifer M. Green, phv, Center for Constitutional Rights, New York, NY, Dorothy

Vinski, phv, Amanda D. Smith, phv, Brobeck Phleger & Harrison, San Francisco, CA, Joshua N. Sondheimer, phv, Center for Justice & Accountability, San Francisco, CA, Ralph Steinhardt, phv, George Washington, University Law School, Washington, DC, Gerald R. Weber, American Civ. Liberties Union Foundation of Georgia, Inc., Atlanta, GA, Paul L. Hoffman, phv, Schonbrun DeSimone Deplow, Harris & Hoffman, Venice, CA, for Kemal Mehinovic.

Andrew Yancy Coffman, Parks Chesin Walbert & Miller, Atlanta, GA, Larry Allen Pankey, Miles McGoff & Moore, Cumming, GA, Laura Clair Horlock, Miles McGoff & Moore, Atlanta, GA, for Nikola Vuckovic.

Dorothy Vinski, phv, Amanda D. Smith, phv, Brobeck Phleger & Harrison, San Francisco, CA, Joshua N. Sondheimer, phv, Center for Justice & Accountability, San Francisco, CA, Gerald R. Weber, American Civ. Liberties Union Foundation of Georgia, Inc., Atlanta, GA, for Safet Safet Hadzialijagic, Muhamed Muhamed Bicic, Hasan Hasan Subasic.

## ORDER

SHOOB, Senior District Judge.

| | | |
|---|---|---|
| I. | Introduction | 1329 |
| II. | Background | 1329 |
| III. | Defendant Nikola Vuckovic | 1331 |
| IV. | The Plaintiffs' Ordeals | 1332 |
| | A. Kemal Mehinovic | 1332 |
| | B. Muhamed Bicic | 1334 |
| | C. Safet Hadzialijagic | 1336 |
| | D. Hasan Subasic | 1338 |
| V. | "Ethnic Cleansing"—The Context of Defendant's Actions | 1340 |
| VI. | Jurisdiction | 1343 |
| VII. | Plaintiffs' ATCA and TVPA Claims | 1343 |
| | A. Torture | 1344 |
| | 1. ATCA | 1344 |
| | 2. TVPA | 1347 |
| | B. Cruel, Inhuman, or Degrading Treatment | 1347 |
| | C. Arbitrary Detention | 1349 |
| | D. War Crimes | 1350 |
| | 1. Common Article 3 | 1350 |
| | 2. Grave Breaches | 1351 |
| | E. Crimes Against Humanity | 1352 |
| | F. Genocide | 1354 |
| VIII. | Liability for Aiding and Abetting | 1355 |
| IX. | Municipal Law Claims | 1357 |
| | A. Assault and Battery | 1357 |
| | B. False Imprisonment | 1357 |
| | C. Intentional Infliction of Emotional Distress | 1357 |
| | D. Conspiracy | 1358 |
| X. | Damages | 1358 |
| | A. Compensatory Damages | 1358 |
| | B. Punitive Damages | 1359 |

XI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1360

## I. *Introduction*

This is an action for torture, cruel, inhuman or degrading treatment, arbitrary detention, war crimes, crimes against humanity, genocide, and municipal torts brought by four refugees from Bosnia–Herzegovina against Georgia resident Nikola Vuckovic,[1] a former Bosnian Serb soldier. Plaintiffs allege that Vuckovic committed acts of brutality against them in detention facilities in Bosnia–Herzegovina ("Bosnia") during the so-called "ethnic cleansing" campaign directed against Bosnia's non-Serb population. Plaintiffs are each Bosnians of Muslim ethnic descent.

Trial was specially set for October 22, 2001. When defendant Vuckovic failed to appear, the Court declared Vuckovic in default and struck his answer. The Court then conducted a one-and-a-half day bench trial on the merits. Witnesses included each of the four plaintiffs, the person who first recognized Vuckovic in the United States, and a former senior researcher for Human Rights Watch, Diane Paul, who testified as an expert witness. The Court also accepted the prepared direct testimony of Ms. Paul and physician Vincent James Iacopino, and documentary exhibits submitted in support of plaintiffs' claims.

Upon careful consideration of the evidence presented at trial and the entire record in this matter, the Court finds that plaintiffs are entitled to a judgment against defendant for both compensatory and punitive damages as set forth in the findings of fact and conclusions of law below.

## FINDINGS OF FACT

## II. *Background*[2]

The events at issue in this case took place against the backdrop of the inter-ethnic conflict that engulfed the former nation of Yugoslavia in the early 1990s:

1. The modern Yugoslavian state was established in 1946 as a federation of six republics, Serbia, Croatia, Slovenia, Bosnia–Herzegovina ("Bosnia"), Montenegro, and Macedonia; and two autonomous provinces, Kosovo and Vojvodina. Generally, people from all of these regions share the same Slavic ethnic origin. (Prepared Testimony of Diane Paul [hereinafter "Paul P.T."] ¶¶ 10–11).

2. At the same time, each of the republics consisted of groups with varying religious and cultural backgrounds. The northern republics of Slovenia and Croatia, due to their geographic location, had close ties to modern-day Austria and other western European powers under the influence of the Austro–Hungarian Empire. These areas, accordingly, became predominantly Catholic. The eastern republics of Serbia, Montenegro, and Macedonia, as well as

---

**1.** Plaintiffs believe that "Vukovic" is the correct Bosnian spelling of defendant's last name. However, according to plaintiffs, the alternate spelling contained in the caption appears in various public records. Furthermore, defendant raised no objection to that spelling while he was participating in this case. Therefore, the Court will use that spelling in this order.

**2.** For this background, the Court has relied primarily on the testimony of expert witness Diane Paul. In addition, the Court has relied on documents introduced into evidence and on decisions of the International Criminal Tribunal for the Former Yugoslavia ("ICTY"). In particular, the decision of the ICTY in *Prosecutor v. Tadic*, Case No. IT–94–1, Opinion and Judgment (Trial Chamber II, May 7, 1997) ¶¶ 53–126, provides a comprehensive review of the background of the conflict that supports these findings.

Bosnia–Herzegovina and the province of Kosovo lived for many years under the rule of the Ottoman Empire. Under the Ottoman influence, many people in these areas adopted the Islamic faith. The population of Serbia, Montenegro, and Macedonia, however, remained primarily Christian Orthodox, based on ties to Russia and the influence of the Christian Orthodox church. (Paul P.T. ¶ 8).

3. Bosnia hosted the most ethnically diverse population of the six Yugoslav republics and was unique in that, unlike the other republics, it had no majority ethnic population. According to a 1991 census, approximately 44 percent of Bosnia's population was Muslim, 31 percent Serb Orthodox Christians, or "Serbs," and 17 percent Croatian Catholics, or "Croats." [3]

4. Overlaying this ethnic patchwork, each of the republics—including multi-ethnic Bosnia—increasingly became home to an emerging "nationalist" identity. (Paul P.T. ¶¶ 10–24).[4]

5. Though significant inter-ethnic atrocities were committed in this Balkan region during the Second World War, particularly by Croat groups against Serbs, Yugoslavia's post-war Communist leader, Marshal Tito, managed to keep ethnic animosities and separatist nationalist movements under check. (Paul P.T. ¶¶ 10–11). In Bosnia, members of different ethnic and religious backgrounds appear generally to have coexisted peacefully, including in plaintiffs' home town of Bosanski Samac, as plaintiffs testified. Members of each of the three major ethnic groups worked together, intermarried, and served together in government and the military.[5]

6. The death of Tito in 1980 left a political void, particularly with the concurrent decline of the Soviet Union. Nationalist Serb leaders took advantage of this situation and launched a movement to create a "Greater Serbia" by uniting Serbs throughout the various Yugoslavian republics. Slobodan Milosevic, in 1989 the head of the League of Communists of Serbia, played a significant role in promoting and implementing this vision. (Paul P.T. ¶¶ 12–14).

7. Beginning with the June 1991 declaration of independence by Slovenia, followed months later by Croatia, several of the former republics began to "break away" from the Yugoslavian state. These efforts were met with attacks by the Yugoslavian armed forces ("JNA"), which increasingly came under Serbian control. (Paul P.T. ¶¶ 16–22).

8. In 1991, Bosnian Serb and Serbian military forces began preparing through a variety of measures for a takeover of territory within the Republic of Bosnia–Herzegovina. Each republic had been home to a network of weapons stockpiles under the control of "territorial defense" ("TO") units. The TO units were civilian defense units under the control of the government of each republic. By the autumn of 1991, Serbian militias began appearing in Serbian-populated areas of Bosnia. Hoping to avoid a confrontation with the JNA, the Bosnian President Alija Izetbegovic allowed the "federal" army to confiscate weapons from Bosnian territorial defense units. These weapons went largely to the Serbian militias. JNA units that had been withdrawn from Croatia and Slovenia began openly distributing weapons to Serb

---

3. *Tadic* ¶¶ 57, 65.

4. *See also id.* ¶¶ 65–79.

5. *Id.* ¶¶ 64, 108–09; *see also* ICTY, *Prosecutor v. Todorovic,* Case No. 1–95–9/1, Sentencing

Judgment (Trial Chamber I, July 31, 2001) ¶ 90 (quoting statement by Bosanski Samac police chief, in guilty plea to persecution of non-Serbs, referring to "prewar times when all people of Bosnia lived in unity and happily together").

militias. (Paul, Trial Transcript, Oct. 23, 2001 [hereinafter Tr. Vol. II], at 8:13—9:13; 13:16—15:6; Paul P.T. ¶¶ 17, 22–23, 35).

9. On the political front, beginning in 1991, the principal Bosnian Serb political party began establishing so-called "Crisis Staffs" or "Crisis Committees" in Serb-populated municipalities. These committees began preparations for the takeover of power and for the subsequent implementation of plans to "ethnically cleanse" these areas of non-Serbs. In January 1992, a separatist assembly of Bosnian Serbs within the Bosnian Republic declined to become part of an independent multi-ethnic state, and declared an independent Serb republic, called the "Serbian Republic of Bosnia and Herzegovina" or "*Republica Srpska.*" (Paul, Tr. Vol. II at 7:15—17:12; Paul P.T. ¶¶ 28–34).

10. In March 1992, voters in Bosnia–Herzegovina approved a referendum on independence, though many Serbs, incited by Serb separatists, refused to participate. Using the international recognition of Bosnia's independence as a pretext, Bosnian Serb and Serb forces invaded and began seizing control of territory throughout the former republic. On April 17, 1992, the JNA and Serb paramilitary forces from Bosnia and Serbia occupied the municipality of Bosanski Samac, near a Serb-controlled area of Croatia. This was one of the first areas to come under attack by these forces. In the first weeks of the war, pro-Serb forces had seized from 50–70 percent of the territory of Bosnia, particularly in the northern, eastern, and central areas of the former republic. (Paul P.T. ¶¶ 23–25).

11. Throughout these areas, Serb forces immediately began a campaign of terror against the Bosnian Muslim population, which included killings, rapes, detention, looting and destruction of property, forced displacement, forced labor, and other abuses. This campaign, which shocked the world's conscience, has come to be known as "ethnic cleansing." (Paul, Tr. Vol. II at 17:3—18:15; 19:13—23:8; Paul P.T. ¶¶ 26, 46–49).

12. The four plaintiffs in this case each were detained without charge and subsequently tortured in *ad hoc* detention facilities in their home town of Bosanski Samac in northern Bosnia in the days and weeks following the Serb takeover of that area.

### III. *Defendant Nikola Vuckovic*

13. Defendant Vuckovic is an ethnic Serb from the former Yugoslavia who was residing in Georgia when this suit was filed. (Defendant's First Amended Answer ("FAA") ¶¶ 6–7). Vuckovic moved to Bosanski Samac with his wife, a Bosanski Samac native, some years prior to the events at issue in this case. (*Id.* ¶ 7; Trial Transcript, October 22, 2001 [hereinafter Tr. Vol. I] at 15:18—17:22). Prior to the takeover by Serb forces, Vuckovic began serving as a soldier in the Fourth Detachment (5th Battalion) of the 2nd Posavina Brigade of the Bosnian Serb Army, stationed in Bosanski Samac. (Plaintiffs' First Amended Complaint ¶ 19; FAA ¶ 19). This brigade was a paramilitary arm of the Bosnian Serb army, and its arms and uniforms were supplied by the JNA. (Paul, Tr. Vol. II, at 38:19—39:19; Paul P.T. ¶ 48).

14. Plaintiffs each knew or were acquainted with Vuckovic from before the war through his own residence in Bosanski Samac, or through contact with his wife and sister. (*See* Part IV *infra.*) However, as the Serb "ethnic cleansing" campaign was launched, Vuckovic turned against the town's non-Serb population. He beat plaintiffs and committed acts of cruelty and humiliation against them while they were detained at a police station and other

detention facilities in Bosanski Samac. (*Id.*).

15. The Court is satisfied that the defendant named and served in this action is the person identified by plaintiffs as having committed these abuses against them. In stipulations of fact and in his First Amended Answer, Vuckovic admitted to facts establishing his identity as the person named by plaintiffs in this suit. Among other things, Vuckovic admitted that he was a soldier in the Fourth Detachment of the Bosnian Serb 2nd Posavina Brigade, that his wife's name is Mersada, and that she is, ironically, herself a Bosnian Muslim. (FAA ¶¶ 6–8, 19; Facts Stipulated by the Parties, Pretrial Order, Attachment E). Plaintiffs identified Vuckovic at trial through photographs taken of him by an Atlanta newspaper for an article relating to this lawsuit, by past identifications, and by descriptions of his background consistent with each other and with Vuckovic's own admissions. (Tr. Vol. I, at 17:23—19:18; 27:25—29:19; 52:7—53:3; 85:11–15). Vuckovic's photo was further identified at trial by Kemal Halilovic, also a former Bosanski Samac resident, who had seen Vuckovic in an Atlanta suburb before this suit was initiated and alerted plaintiff Kemal Mehinovic that the person who had tortured Mehinovic in Bosnia was now here in the United States. (*Id.* at 97:19—102:6).

## IV. *The Plaintiffs' Ordeals*

16. All four plaintiffs are Muslim citizens of Bosnia–Herzegovina from the town of Bosanski Samac in northern Bosnia. Each was living a normal life as a civilian when Serb military and paramilitary forces from Bosnia and elsewhere in the former Yugoslavia seized control of Bosanski Samac and the surrounding area on April 17, 1992. Though none of the plaintiffs were combatants in the armed conflict erupting at the time in the former Yugoslavia, each was subsequently detained for prolonged periods without charge, under inhumane conditions, and subjected by defendant Vuckovic and others to severe beatings and other acts of cruelty and humiliation.

### A. *Kemal Mehinovic* [6]

17. Plaintiff Kemal Mehinovic is 42 years old, and was born and raised in the town of Bosanski Samac. He is married and has two children. He currently resides in Salt Lake City, Utah.

18. Mehinovic initially worked as a baker at his father's bakery in Bosanski Samac. In 1981, he opened a restaurant with his brother. He also worked full time as an inspector in a boiler company, working in his restaurant in the evenings.

19. Mehinovic had known defendant Vuckovic since the 1970s and had personal ties to him. Vuckovic was a frequent customer in Mehinovic's father's bakery, and Vuckovic's brother-in-law worked in the bakery. Vuckovic's sister visited the bakery almost every day. Vuckovic's wife, Mersada, grew up a few blocks from Mehinovic's home, and Mehinovic had known her his entire life.

20. In the days after the Serb seizure of Bosanski Samac, Mehinovic was required to report to the Bosanski Samac police station and was required to perform forced labor, digging trenches at the front line for the Serbian forces. Mehinovic was issued a white strip of cloth by Serb police and required to wear it on his hand when moving about the town to identify himself as a non-Serb.

21. On May 27, 1992, Mehinovic was taken into custody at his home by two Serb policemen in military uniform. They had no arrest warrant and did not advise

---

6. Except as otherwise noted, the Court's findings regarding plaintiff Mehinovic are based on Mehinovic's trial testimony at Tr. Vol. I at 12:10—25:20 and Tr. Vol. II at 56:14—79:13.

him that he was charged with any offense. The policemen beat him on the steps of his house and hit him with "brass knuckles." Mehinovic was taken to the local police station.

22. When he arrived at the police station, Mehinovic saw defendant Vuckovic in the station, wearing the same uniform worn by the policemen that arrested him and other Serb soldiers and guards at the station. Defendant told Mehinovic that he would "see him later."

23. Mehinovic was taken into an interrogation room at the police station and was interrogated by Stevan Todorovic, the newly-installed Bosnian Serb Chief of Police,[7] and Todorovic's bodyguards. Although Mehinovic was not involved in political activities, he had gone to school with the President of the local chapter of the leading Bosnian Muslim political party, known as the SDA, and Todorovic demanded information about the SDA and its leadership. Mehinovic was beaten with batons and then with a baseball bat. He was forced to spread his legs and was beaten on his genitals, being told, "You won't be needing that anymore." Mehinovic estimated this interrogation and torture session lasted two or three hours.

24. That evening, defendant Vuckovic entered the interrogation room. Mehinovic was lying on the floor as a result of the previous beatings. Vuckovic kicked him on the left side of his face, disfiguring Mehinovic's face and causing him to be unable to eat for 10 days. Vuckovic also kicked him in the genitals and other parts of his body. As he carried out these beatings, Vuckovic used a derogatory term about Muslims and made remarks that Muslims were an "invented nation" and

that they "don't need to exist." At one point, Vuckovic forced Mehinovic to lick his own blood from the walls while Vuckovic and others stood laughing. That night Mehinovic was in constant fear that he Vuckovic would kill him.

25. Mehinovic was kept in the police interrogation room for several days. Vuckovic came to the interrogation room daily and specifically sought out Mehinovic for beatings. Particularly painful were beatings that Vuckovic inflicted on areas of Mehinovic's body that were already injured from previous beatings.

26. During another interrogation session, Vuckovic watched while police chief Todorovic tortured Mehinovic by dislocating Mehinovic's finger. Todorovic forced Mehinovic to place his hand on a table, palm up, and then hit Mehinovic's hand with the butt of a rifle, dislocating his finger. Mehinovic nearly lost consciousness from the pain. Vuckovic stood laughing in the room with other guards while this was happening. Mehinovic's hand was swollen for two to three months following the incident.

27. Mehinovic was later moved to a small room at the police station, approximately twenty-five square meters, that housed approximately thirty other people, all Muslims and Croats. He remained in that room at the police station for approximately three months. Each day he was fed just one slice of bread smeared with pork fat, which he was forced to eat although it was against his religious principles. He was given water just once a day.

28. Vuckovic also beat Mehinovic during his time in this cell. Vuckovic called for Mehinovic one day at the entrance of the room. As Mehinovic reached the en-

---

7. Todorovic was brought before the ICTY and pled guilty to a charge of "persecution" based on his admitted participation, while serving as Police Chief, in murder, sexual assaults, beatings, arbitrary detention, inhumane treat-ment, forced deportation, and other acts against non-Serb civilians in Bosanski Samac. *Todorovic*, Sentencing Judgment (Trial Chamber) ¶¶ 1–17, 34–48.

trance after passing through the group of other detainees, Vuckovic struck him hard on the back of the head with an object. Vuckovic continued to beat him with a baton and kicked him in the ribs with his boots. This beating caused Mehinovic to scream with pain.

29. As a result of the repeated beatings and threats of beatings, Mehinovic began to involuntarily shake in fear at the thought that his name would again be called for a beating. While in this cell, Mehinovic was forced to clean up blood from victims of other beatings in the hallway outside, and on one occasion he had to carry away the body of a fellow detainee who died following a beating. Having to face these horrors caused Mehinovic extreme fear that he too would be killed.

30. In or about August 1992, Mehinovic was transferred from the police station to a warehouse across the street that had been used as a munitions warehouse for the Bosnian territorial defense, or TO, units. Mehinovic remained in the TO warehouse, detained with some 180 other Muslim and Croat men, from August to November 1992.

31. Mehinovic also endured beatings while held at the TO warehouse. He was beaten with baseball bats, metal pipes, and chair legs. On some occasions, he was tied up and hung against windows during beatings. During others, he was forced to lie on his stomach on the floor and beaten on the soles of his feet. His torturers would then humiliate him and cause further pain by forcing Mehinovic, after suffering beatings to the soles of his feet, to stand up and run around in circles.

32. The prisoners at the TO warehouse were also subject to games of "Russian roulette." In these games, prisoners were arranged in a circle, and a guard or soldier would spin his revolver on the floor. The guard or soldier would then shoot in the direction where it pointed. According to Mehinovic, Vuckovic liked to play this game and shot at Mehinovic on one occasion. Mehinovic was afraid he would be killed during the incident, but the bullet went above his head. Vuckovic said, "Look at that, he's so lucky, the bullet wouldn't hit him."

33. Vuckovic also participated in beatings during which three guards would take a number of the detainees to a yard outside and force them to run in a circle. The guards would then swing wooden planks at them as they ran by. They would be hit so hard that one blow made them fall to the ground in so much pain they were unable to get up. Mehinovic was subject to these beatings and humiliations.

34. Mehinovic was transferred from the TO warehouse to a larger regional detention facility, or "concentration camp," in November 1992. On December 6, 1994, after performing forced labor in various camps and facilities for more than two years, and more than two and a half years after first being detained in Bosanski Samac, Mehinovic finally was released in a prisoner exchange in Sarajevo.

35. Mehinovic suffers from chronic and debilitating medical problems due to injuries received during his detention and abuse. He suffers from constant physical pain, and needs painkillers frequently. He suffers from anxiety, flashbacks, and nightmares and has difficulty sleeping. Mehinovic continues to suffer thinking about what happened to him during this ordeal and has been unable to work as a result of the continuing effects of the torture he endured.

B. *Muhamed Bicic* [8]

36. Muhamed Bicic was born in Bosanski Samac on January 8, 1956, into one of

---

**8.** The Court's findings regarding plaintiff Bicic are based on Bicic's trial testimony at Tr.

the town's prominent Muslim families. Bicic co-owned a pizzeria, a gaming parlor, and a clothing boutique, along with his brother and brother's wife.

37. Bicic was also well acquainted with the defendant and his wife. Mrs. Vuckovic worked as an assistant cook in Bicic's restaurant at one point in the 1980s. Vuckovic's sister, Nada, lived across from the Bicic's pizzeria, and from time to time Bicic encountered Vuckovic and his wife when they visited Nada. Bicic exchanged greetings with them on these occasions.

38. Bicic was the first of the plaintiffs to be detained following the April 17, 1992, occupation of Bosanski Samac. The following day, several police and soldiers broke into Bicic's home, beat him and his brother, and took them to the local police station. The policemen and soldiers did not present any arrest warrant.

39. At the police station, soldiers and police repeatedly kicked and beat Bicic with a variety of objects, including batons, chair legs, and weapons. Later that evening, Bicic and a group of other Muslim and Croat men who also had been detained and beaten were taken across the street to a small room in the TO warehouse, where plaintiff Mehinovic was also later held.

40. Bicic was placed in the small room in the warehouse with as many as 50 other Muslim and Croat men from Bosanski Samac. Each day, members of the Serb paramilitary forces subjected the detainees to sadistic beatings with batons, chair legs, boots, and weapons, often in front of the other detainees. On one occasion, a detainee was beaten to death in front of Bicic and the other detainees. The victim's head was split open and he was shot twice.

41. Bicic and his brother in particular were singled out for beatings because of their wealth and position in the community. Bicic was often beaten until he lost consciousness. The soldiers carrying out the beatings demanded gold and money. On one occasion, soldiers broke the fingers of Bicic's brother, while they beat and taunted Bicic, asking why he was not laughing while watching his brother being tortured.

42. Some 8–10 days after being detained at the TO warehouse, Bicic and the other detainees from the warehouse, including plaintiffs Subasic and Hadzialijagic, were transported in military trucks to detention facilities in military barracks in the outlying region, first in Brcko, then Bijeljina.

43. On March 13, 1992, the group was returned to Bosanski Samac and placed under guard in the gymnasium of the local elementary school. Bicic remained a detainee at the elementary school for the next three-and-a-half months. At the school, Bicic and other detainees were beaten daily and nightly by guards and by local or visiting soldiers and paramilitary troops.

44. While at the school, Bicic and other detainees observed defendant Vuckovic and his wife and family regularly entering and leaving a home next to the school that had belonged to a Muslim family before the war. Bicic and other detainees determined that Vuckovic and his family had occupied the house.

45. Vuckovic came to the elementary school at least once a week to participate in or oversee beatings of detainees. Vuckovic beat Bicic on many occasions and was present during other beatings he received. He often used a revolver that he always carried to strike Bicic and other detainees. On one occasion, Vuckovic ordered Bicic to get on all fours while another soldier stood or rode on his back and beat him with a baton—a game the soldiers called "horse."

Vol. I at 26:16—50:12.

Vuckovic also subjected Bicic and other detainees to games of "Russian roulette," putting a bullet in his revolver and pulling the trigger while aiming at or just above the heads of the detainees. Bicic was afraid he would be shot and killed by Vuckovic.

46. During these beatings, Vuckovic taunted Bicic and other detainees with ethnic slurs, calling them "balija," an epithet for Muslims, and Muslim "Mothers." Detainees, including Bicic, were often humiliated by being forced to sing Serbian songs while they or their fellow detainees were being beaten. Vuckovic participated in this abuse.

47. On one evening, Vuckovic along with a group of 10–15 soldiers came to the school and beat many of the detainees and forcibly extracted their teeth with pliers. Bicic was among the many victims of this incident. The soldiers dragged Bicic into a locker room in the gymnasium, forced him to the ground with his hands behind his back, stuck wooden instruments or objects into his mouth to keep his jaw open, and extracted several teeth with pliers.

48. Bicic suffered eight broken ribs during his detention, a broken nose and finger, and numerous scars on the head and elsewhere. He suffered internal injuries as well and urinated blood for over a month at one point. Each of these beatings caused Bicic to suffer immense pain that lasted for days. While detained, Bicic lost well over half of his body weight.

49. Today, Bicic continues to suffer from the beatings perpetrated by Vuckovic and others. He feels severe pain and headaches, particularly when the weather changes. He suffers from anxiety, sleeps very little, and has frequent nightmares. At the same time, as a result of damage to his kidneys suffered during his ordeal, doc-

tors have advised him not to take any sedatives. Bicic has found it impossible to return to work and described his frustration at no longer feeling like a "normal person" able to sustain himself through work.

50. After being released from detention, Bicic fled Bosnia with his wife and daughter and currently lives as a refugee in Germany. He lost all his property and businesses in Bosanski Samac.

### C. *Safet Hadzialijagic* [9]

51. Safet Hadzialijagic also is a Bosanski Samac native. Before the war, he worked as the manager of the municipal water system in Bosanski Samac and owned a mixed goods store.

52. Hadzialijagic was acquainted with Vuckovic prior to the war. He saw Vuckovic in the town, and he knew Vuckovic's wife and sister.

53. A few days after the Serbian occupation of Bosanski Samac, Hadzialijagic received a call from the newly-installed Bosnian Serb police chief, Stevan Todorovic, and was told to report to the local police station to receive "instruction" on how to behave under the new government installed in the town. Although he feared trouble, a neighbor advised Hadzialijagic that it would be in his best interests to comply with the demand.

54. Immediately upon his arrival at the police station, Todorovic hit Hadzialijagic twice in the head. Another soldier in police uniform then beat Hadzialijagic further and took him to a cell at the station. At the police station, Hadzialijagic was subjected to further beatings and abuse. In one incident, his captors subjected him to a game of "Russian roulette," placing a

---

**9.** The Court's findings regarding plaintiff Hadzialijagic are based on his trial testimony at Tr. Vol. I at 50:25—70:4.

gun in his mouth and pulling the trigger twice before pointing away and shooting out a window.

55. Hadzialijagic was then transferred to the TO warehouse, and to detention facilities in Brcko and Bijeljina, along with plaintiffs Bicic and Subasic and a group of other Muslim and Croat men from Bosanski Samac. On or about March 13, 1992, the group was brought back to Bosanski Samac and held in detention at the local elementary school.

56. Hadzialijagic and other captives were subjected to repeated daily beatings by guards and by visiting soldiers, paramilitary forces, and policemen. The detainees were beaten with metal pipes, bats, sticks, and weapons. Detainees sometimes were awoken at night and beaten. The detainees were all kept together, so Hadzialijagic regularly saw or heard the screaming of others being beaten. Hadzialijagic also was a victim of the teeth-pulling incident previously described, during which he had five teeth forcibly extracted from his mouth with pliers. Two other teeth were so damaged and loosened in the incident that he removed them himself the same evening. Hadzialijagic's tormentors routinely made defamatory statements against Muslims as they perpetrated these beatings. They would state that Muslims should be killed.

57. Hadzialijagic was singled out by defendant Vuckovic on one occasion and subjected by him to a particularly severe beating. On that day, Vuckovic appeared with a group of three or four other soldiers. Vuckovic was the leader. Vuckovic ordered Hadzialijagic to kneel on his hands and knees and then sat on his back. Hadzialijagic had to carry Vuckovic across the gymnasium in this manner, carrying Vuckovic like a horse and rider. While Vuckovic rode Hadzialijagic like an animal, Vuckovic hit him in the head and on his body with the handle of a knife, and the other soldiers kicked and hit him. If Hadzialijagic fell down, the soldiers forced him to get up and continue.

58. At one point, Vuckovic and the other soldiers tied Hadzialijagic with a rope, hung him upside down, and beat him. When they noticed that Hadzialijagic was losing consciousness, they dunked his head in a bowl used as a toilet.

59. Hadzialijagic suffered numerous blows to his head and face in this incident. His face was deformed and bleeding, and the boots and uniforms of his captors were bloodied as well. At one point, Vuckovic ordered Hadzialijagic to lick his blood off Vuckovic's boots. As he tried to lick the blood, Vuckovic kicked Hadzialijagic with the heel of his boot. Hadzialijagic thought he would be killed that day.

60. At the conclusion of this incident, Vuckovic used his knife to cut a rude semicircle into Hadzialijagic's forehead, representing a crescent, a symbol of the Muslim faith. As he carved the crescent into Hadzialijagic's forehead, Vuckovic called Hadzialijagic "balija," a defamatory term for Muslims, and stated that Muslims deserved such treatment. The crescent scar on Hadzialijagic's forehead is still visible today.

61. Hadzialijagic was severely injured during this incident and went into cardiac arrest. He was saved by plaintiff Hasan Subasic when guards gave Subasic permission to summon medical help from a nearby ambulance corps. Hadzialijagic suffered six broken ribs as a result of the beatings he received in this and other incidents in detention.

62. Following his ordeal in detention, Hadzialijagic fled to Belgium, where he currently resides. Hadzialijagic continues to suffer chronic pain throughout his body and has frequent nightmares. He has had to use medication to help him sleep. His

experience has made him feel depressed and reclusive, and he has not been able to work since he escaped from this ordeal.

### D. *Hasan Subasic* [10]

63. Plaintiff Ḥasan Subasic was born in Odzak, Bosnia, near Bosanski Samac. He was raised from the age of three in Bosanski Samac. He is married and has two children and now resides in the United States.

64. Subasic was detained on April 24, 1992, when four policemen with Serbian police insignia on their uniforms came to his home and told him that he had to come to the police station. They told Subasic he needed to give a statement, and that it should only take an hour or two. He felt he had no choice and complied with their demand. After being questioned for an hour or two at the police station, he was not released, but rather placed in detention at the TO warehouse.

65. Neither the police that arrested him, nor anyone at the police station, advised Subasic of any charges against him, showed him a warrant for his arrest, or advised him that he could see a lawyer. Subasic remained captive for some 26 months in various detention centers and labor camps. Subasic was just 24 years old when he was detained.

66. At the TO warehouse, Subasic was detained in the same small room as plaintiffs Bicic and Hadzialijagic. When he had an opportunity to see the faces of the other detainees, he had difficulty recognizing them at first as their faces were bruised, cut, and deformed from beatings. Subasic was detained for three days at the warehouse. While there, Subasic witnessed a variety of abuses and atrocities, including the brutal beating and murder of a fellow

detainee less than a meter away from him. The victim was beaten with a chair leg until his head split open and brains spilled out on the floor. The victim was then taken outside and shot.

67. At the warehouse, Subasic and other detainees were awakened and forced to sing Serb nationalist songs while guards and members of Serbian special police units beat them with weapons, pipes, and other instruments. They were hit on the head and in bony areas where it would hurt most.

68. Subasic, along with co-plaintiffs Bicic and Hadzialijagic, was transferred from the warehouse to detention centers at Brcko and Bijeljina and returned about two weeks later to Bosanski Samac. Upon his return, he was held in detention at the elementary school gymnasium, where he was again subjected to frequent brutal beatings. Ironically, the school was the same school that he had attended as a youth.

69. Beatings took place throughout the day and night at the elementary school, with Serbian police, soldiers, and Serbian civilians taking part in the abuse. Subasic often heard guards in an adjacent room scheduling forthcoming beatings, making arrangements as to the time of the next round of beatings, who they would take out of the gymnasium for beatings, how many victims or soldiers there would be, and how many new detainees were at the school. While at the elementary school, Subasic observed Vuckovic on a number of occasions driving to and from the nearby home that had belonged to a Muslim family before the war.

70. Subasic was routinely beaten at the elementary school. On one occasion, Su-

---

**10.** The Court's findings regarding plaintiff Subasic are based on his trial testimony at Tr. Vol. I at 70:11—95:10.

basic was forced to kneel and spread his arms in front of him while encircled by three or four guards. The guards hit and kicked him, breaking three ribs and leaving him virtually immobile for three days because of his injuries and pain. Subasic felt that he was in imminent danger of death at all times while detained at the school.[11]

71. Subasic too was a victim of the teeth-pulling incident. On that night, he was taken out into a hallway by guards, kicked, beaten and forced to open his mouth. Guards forcibly extracted four of Subasic's teeth.

72. Subasic and his fellow Muslim detainees also were subjected to other humiliations based on their religion. In one incident, they were forced to kneel for twenty hours straight as if engaging in Muslim prayer. Subasic was often beaten in the genitalia, with guards making comments that this would prevent any more Muslim children from being born. The only food made available was a small amount of bread smeared with pork fat. It was well known to the guards that it was against the Muslim religion to eat pork.

73. Subasic had seen defendant Vuckovic in Bosanski Samac prior to the war and recognized him when he came to the elementary school. Subasic was directly beaten by Vuckovic on two occasions. On both occasions, Vuckovic punched him and kicked him with his military boots. On at least one occasion, Subasic had been forced into a kneeling position when Vuckovic kicked him in the stomach. These beatings caused Subasic to lose his breath and to suffer severe physical and emotional pain. Subasic stated that these beatings caused him to fear for his life and made him feel like "less than an animal." Suba-

sic stated that his mental anguish was as great as his physical pain, because he felt helpless at being unable to defend himself.

74. Subasic also witnessed Vuckovic brutalize plaintiffs Bicic and Hadzialijagic. Subasic remembers in particular the incident in which Vuckovic carried out a severe beating of plaintiff Hadzialijagic, described above, because it was so extreme. Subasic testified that he felt anguish that is impossible to describe from being forced to observe his fellow detainee be subjected to such abuse. Indeed, Subasic appealed to a guard to get an ambulance for Hadzialijagic, who had been gravely injured from the beatings. Subasic was told the radio did not work and was given permission to run down the street to summon medical help. Subasic felt he was risking his life in doing so, as he believed he could have been shot by a Serb policeman or soldier mistaking him for an escaped prisoner.

75. Subasic was taken from the school to the TO warehouse, where he was kept for approximately one-and-a-half months. He was then transferred to the Batkovic camp and was eventually released in a prisoner exchange in 1994.

76. Subasic felt particular anguish at being separated from his family during his long detention. He worried that he might never see his newborn daughter again. His daughter was two months old when Subasic was first detained. When he was reunited with his family after some 26 months in detention, she would run away from him when left alone with him because he seemed to be a stranger.

77. As a result of his detention, Subasic lost approximately half of his body weight. He continues to suffer intense pain in his

11. Police Chief Todorovic admitted to participating in repeated beatings of Bicic, among others, at the elementary school and TO warehouse. *Todorovic,* Sentencing Judgment (Trial Chamber) ¶¶ 9, 41.

mouth as a result of the teeth extractions, and in his ribs, joints, stomach, and hands as a result of the repeated beatings he endured. He has flashbacks and nightmares, suffers from nervousness, angers easily, and has difficulty trusting people. These effects directly impact and interfere with his ability to work.

## V. "ETHNIC CLEANSING"—THE CONTEXT OF DEFENDANT'S ACTIONS [12]

78. The abuses committed by defendant Vuckovic against plaintiffs were not isolated incidents, but rather took place within the context of the campaign by Bosnian Serb and Serbian military and political forces to "cleanse" broad areas of Bosnia of its Muslim and Croat population through terror, mass displacement, detention, and murder.

79. "Ethnic cleansing" was the means by which nationalist Serb leaders sought to create a contiguous ethnically-pure Serb territory throughout the ethnically-mixed areas bordering the Serbian republic, including Bosnia and Croatia. Serb leaders and the Serbian-controlled media increasingly promoted this vision of a "Greater Serbia" in the early 1990s and fomented fear and hatred of Muslims and Croats. In the early 1990s there were rallies that advocated and promoted these views, with Serbian leaders in attendance. (Paul P.T.

¶¶ 13–15). By 1992, some Bosnian Serb leaders openly advocated measures to rid ethnically-mixed areas of non-Serbs, including pressure and terror tactics, deportation, and liquidation.[13]

80. Within weeks of the outset of armed attacks by Bosnian Serb and Serb forces in Bosnia, Bosnian Serbs maintained control over at least half of the territory of the former republic. The ethnic cleansing campaign was carried out throughout these Serb-controlled areas of Bosnia, and affected the entire Balkans region. (Paul, Tr. Vol. II at 30:5—31:16). According to our own Department of State, by the end of 1992 an estimated one-half of the entire Bosnian Muslim population had been displaced. (Paul P.T. ¶ 102).[14] Hundreds of thousands of refugees streamed into Croatia and other neighboring areas. (Paul P.T. ¶ 99).

81. The extent of the campaign can be measured by its results and aftermath. In the Bosanski Krajina region of northwest Bosnia, for example, the non-Serb population prior to the ethnic cleansing campaign was 536,000. It is estimated that fewer than 20,000, or just 3.7 percent, remained as of 1995. Prior to the Serb takeover of Bosanski Samac, the population of the town and surrounding area was 33,000, divided almost equally between Serb and non-Serb groups. After the ethnic cleans-

---

**12.** For the findings in this section, the Court has relied on the testimony of expert witness Diane Paul, the ICTY's *Tadic* decision, as well as the following documents in evidence, which provide authoritative descriptions of the outlines of the "ethnic cleansing" campaign: U.S. Dept. of State, *Country Report on Human Rights Practices for 1992*, Bosnia–Herzegovina, at 719–730, Plaintiffs' Exhibit 22; Final Report of the Commission of Experts Established Pursuant to Security Council Resolution 780 (1992) [hereinafter "U.N. Comm'n of Experts"], Plaintiff's Exhibit 20, and Annexes IV ("The Policy of Ethnic Cleansing") and VIII ("Prison Camps") there-

to. *See* Paul, Tr. Vol. II at 6:13–19 (noting reliability and credibility of the Commission's Report). Both the Report and Annexes are available at *http://www.ess.uwe.ac.uk/comexpert/. See also* Helsinki Watch, Human Rights Watch, War Crimes in Bosnia–Herzegovina I–II (1992).

**13.** *Tadic*, Opinion and Judgment (Trial Chamber) ¶ 89.

**14.** U.S. Dept. of State, *Country Report on Human Rights Practices for 1992*, Bosnia–Herzegovina, at 724–25, Plaintiffs' Exhibit 22.

ing, less than 2 percent (300) of the pre-war non-Serb population of 17,000 remained. (Paul, Tr. Vol. II at 44:12—45:5; Paul P.T. ¶ 41).

82. The ethnic cleansing campaign was plainly carried out by design and with the coordination of political and military leaders in all the territories brought under Bosnian Serb control. Through actions such as the creation of a separate Bosnian Serb assembly, the establishment of Serb-controlled local crisis committees and regional quasi-governmental bodies ready to seize control of governmental functions, and seizures of the territorial defense weapons stockpiles, already outlined above, Bosnian Serbs and Serbia laid the groundwork to begin and quickly implement ethnic cleansing with the commencement of military and paramilitary operations in Bosnia. (Paul, Tr. Vol. II at 7:15—17:12; Paul P.T. ¶¶ 28–34).

83. The rapidity with which Bosnian Serbs assumed control of government functions and began carrying out initial stages of ethnic cleansing evidences significant advance planning. (Paul Tr. Vol. II at 16:16—17:12). Plaintiffs testified that Bosnian Serb civilians became police officers overnight: some of the plaintiffs were arrested in the days following the April 17, 1992, occupation of Bosanski Samac by Bosnian Serbs in police uniform who had been civilians prior to April 17. Stevan Todorovic, who has pled guilty at the ICTY to the grave crime of persecution of non-Serbs in Bosanski Samac, served as a member of the town's Serb "Crisis Committee" and was installed as the Bosnian Serb police chief at or around the time of the attack.[15]

84. Carrying out the ethnic cleansing campaign with such speed and on such a massive scale also required a high degree of coordination between Bosnian Serb military and political authorities, as well with Serbia and its political, military, and paramilitary forces. Orders relating to ethnic cleansing operations were sent from the Bosnian Serb government and channeled through the crisis committees and the new Serb-controlled governments. The committees worked together with military and paramilitary forces to carry out ethnic cleansing operations and in some cases even hired paramilitary forces to attack towns or outlying villages. (Paul, Tr. Vol. II at 8:13—11:12; 15:7—18:15).

85. Ethnic cleansing operations were coordinated across borders as well. The Serb-controlled JNA supplied arms and heavy weapons to Bosnian Serb paramilitary and military forces, and Serbian paramilitary forces participated in joint actions with Bosnian Serb forces in seizing control of Bosnian territory and displacing the non-Serb population. Notoriously violent Serbian paramilitaries, themselves supported by the JNA, operated freely in these areas, including in Bosanski Samac. (Paul, Tr. Vol. II at 7:13—18:2; Paul P.T. ¶ 47–48).

86. As has been extensively documented by international bodies, human rights organizations, and other bodies, ethnic cleansing also followed a distinct pattern and practice. Typically, a town or village was attacked with heavy weaponry and artillery, despite the fact that in most areas, there was little or no resistance by non-Serb forces. In multi-ethnic towns, non-Serb neighborhoods were targeted. Many Muslim villages were simply destroyed in total. These attacks were designed to terrorize and displace the Muslim population. As there was little or no military resistance, these attacks were not

---

**15.** Todorovic admitted to being designated Chief of Police beginning March 28, 1992, a few weeks prior to the April 17, 1992, take-over of Bosanski Samac. *Todorovic,* Sentencing Judgment (Trial Chamber) ¶ 60.

part of a military campaign, but rather were ethnic cleansing operations directed against civilians and civilian objects. (Paul, Tr. Vol. II at 13:19—21:6; Paul. P.T. ¶¶ 46–49).

87. Following these initial attacks, non-Serb men were detained and, in some cases, executed. Political and business leaders typically were rounded up first, followed by others. (Paul, Tr. Vol. II at 21:8—22:17; Paul P.T. ¶¶ 50–62). Indeed, plaintiffs Bicic and Hadzialijagic, prominent business and government figures in Bosanski Samac, were the first of plaintiffs to be detained after the town was seized.

88. Those who did not flee, or who were not killed, became victims of other practices designed to further ethnic cleansing. Both in and outside of detention facilities, non-Serbs commonly were subject to rape and other forms of sexual assault and humiliation. Those in detention and those remaining in towns and villages often were required to perform forced labor—often dangerous or arduous tasks such as digging trenches on the front lines of fighting, or working in fields for long hours with only bare hands. In some areas, civilians, especially women and children, were confined to ghetto villages. Some were forced out of their homes and bused to border areas. (Paul, Tr. Vol. II at 22:17—35:21; Paul P.T. ¶¶ 63–77). The Bosnian Serb police chief, Todorovic, admitted to participating in such forcible transfers in Bosanski Samac.[16]

89. Throughout areas brought under Serb control, Serb forces plundered, destroyed, or expropriated homes and businesses of Muslims and Croats.[17] In some areas, military forces methodically shot artillery at each Muslim home, one by one,

systematically destroying the houses for no tactical reason. Particularly in mixed areas in the towns, many non-Serb homes were taken over by Serb families or soldiers after their non-Serb owners were killed or forced out. (Paul, Tr. Vol. II at 25:16—27:16, 35:4–21; Paul P.T. ¶¶ 78–84). As noted above, for example, defendant Vuckovic apparently occupied the home of a Muslim family close to the elementary school.

90. Religious leaders also were targeted for repression, and places of worship systematically demolished. The destruction of non-Serb religious property was so complete that today, just one mosque remains in all of the present-day *Republica Srpska* out of the more than 600 that existed prior to the war. In Bosanski Samac, the central mosque and church both were leveled, and the rubble removed to a dump site outside of town. The sites are now just empty lots covered with weeds. (Paul, Tr. Vol. II at 21:8—22:17, 40:25—44:10; Paul P.T. ¶¶ 85–87).

91. Detention of non-Serb men, and the terrorization of detainees, was a salient feature of ethnic cleansing. The U.N. Commission of Experts identified over 300 Serb-controlled detention facilities in more than 90 municipalities in Bosnia, all holding predominantly Muslim and Croat draft age males.[18]

92. The detention of large numbers of non-Serb males furthered ethnic cleansing by facilitating control of the non-Serb population. Additionally, although detainees technically remained in the Serb-controlled areas, Serb intentions were eventually to force detainees out of Bosnia, as detainees appear to have been held largely as "bar-

---

16. *Todorovic,* Sentencing Judgment (Trial Chamber) ¶ 45.

17. According to the ICTY, Bosanski Samac was subject to "plunder and looting" by

Serbs; Todorovic also admitted to participating in these activities. *Id.* ¶ 47.

18. *See* U.N. Comm'n of Experts, note 13 *supra,* Annex VIII, Part C.

gaining chips" to be exchanged later for Serb prisoners held by Croatia or Bosnia. Each of the plaintiffs, for example, was released in an exchange that, while securing his freedom, left him far from his home in Bosnia. Detainees were routinely terrorized, murdered, tortured, raped, and humiliated, serving the ethnic cleansing campaign by causing detainees to fear returning to their home towns following their release. (Paul, Tr. Vol. II at 31:14—35:3; Paul P.T. ¶¶ 52–62).

93. Milosevic's Serbia and the separatist Bosnian Serb leadership met with considerable success in their objective of creating an ethnically pure Serbian territory in Bosnia. As indicated above, less than five percent of the original Muslim and Croat populations remain in most areas subject to the ethnic cleansing campaign. Under the 1995 Dayton Agreement, approximately one half of the former territory of Bosnia–Herzegovina remains under the administration and control of the Bosnian Serb leadership. Bosanski Samac itself is just one of many areas now part of the Bosnian Serb *Republica Srpska*. (Paul, Tr. Vol. II at 45:6—46:3; Paul P.T. ¶¶ 43, 109–112).

94. Conditions in Bosnian Serb-controlled areas of Bosnia remain hostile to non-Serbs and to any attempt by victims of "ethnic cleansing" to seek justice in these areas. Many Bosnian Serbs who allegedly took part in the abuses described above remain in positions of leadership. There has been little or no effort within the *Republica Srpska* to bring those responsible for war crimes and crimes against humanity to justice. Evidence before the Court suggests that not one alleged war criminal has been prosecuted in the *Republica Srpska*. Bosnian Serb authorities have resisted efforts to investigate ethni-

cally-motivated crimes allegedly perpetrated by Bosnian Serbs. (Paul, Tr. Vol. II at 45:18—46:22; 49:15—50:18; Paul P.T. ¶¶ 104–116). As the U.S. State Department noted in its 1998 report on human rights practices in Bosnia–Herzegovina, courts in *Republica Srpska* were reluctant or unwilling to try cases of human rights abuses referred to them.[19]

### CONCLUSIONS OF LAW

Plaintiffs bring these claims under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350 (1988); the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. No. 102–256, 106 Stat. 73 (1992)(codified at 28 U.S.C. § 1350 Note); and the laws of the State of Georgia and of Bosnia–Herzegovina.

### VI. *Jurisdiction*

This Court has jurisdiction over plaintiffs' federal claims under the ATCA, the TVPA, and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over plaintiffs' related state law claims under 28 U.S.C. § 1367. *See Abebe–Jira v. Negewo*, 72 F.3d 844, 847–48 (11th Cir.1996), *cert. denied*, 519 U.S. 830, 117 S.Ct. 96, 136 L.Ed.2d 51 (1996); *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996).

### VII. *Plaintiffs' ATCA and TVPA Claims*

The ATCA provides:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350 (1988). The Eleventh Circuit has held that the ATCA provides a

---

**19.** U.S. Dept. of State, *Country Report on Human Rights Practices for 1998,* Bosnia–Herzegovina, at 9, Plaintiffs' Exhibit 28.

federal remedy when (1) an alien sues (2) for a tort (3) committed in violation of the law of nations. *Abebe–Jira*, 72 F.3d at 846–48. As all four plaintiffs are aliens and sue in tort, they clearly meet the first two elements of an ATCA claim.

 As to the third criterion, conduct violates the "law of nations" if it contravenes "well-established, universally recognized norms of international law." *Kadic*, 70 F.3d at 239 (quoting *Filartiga v. Pena–Irala*, 630 F.2d 876, 888 (2d Cir.1980)). To be actionable under the ATCA, these norms must be "specific, universal and obligatory." *Alvarez–Machain v. United States*, 266 F.3d 1045, 1050 (9th Cir.2001). A *jus cogens* violation satisfies, but is not required, to meet this standard.[20]

United States courts may ascertain contemporary norms of customary international law by " 'consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.' " *Filartiga*,

630 F.2d at 880 (quoting *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820)). Among various contemporary sources, the statutes of the ICTY and the International Criminal Tribunal for Rwanda ("ICTR") and recent opinions of these tribunals are particularly relevant.[21] The United States has explicitly endorsed the approach of the ICTY Statute and the convening of the Tribunal.[22]

Plaintiffs have shown, as to each of them individually, that defendant Vuckovic committed the following violations of customary international law, which confer jurisdiction, and establish liability, under the ATCA: torture; cruel, inhuman or degrading treatment; arbitrary detention; war crimes; and crimes against humanity.

### A. Torture

#### 1. ATCA

 United States courts presented with the issue have unanimously recognized that official torture violates obligatory norms of customary international law and is thus actionable under the ATCA.[23]

**20.** *Jus cogens* norms are "rules of international law [that] are recognized by the international community of states as peremptory, permitting no derogation. These rules prevail over and invalidate international agreements and other rules of international law in conflict with them." *Alvarez–Machain*, 266 F.3d at 1050 (quoting Restatement (Third) of Foreign Relations Law § 102, cmt. k.)

**21.** The Tribunals are only empowered to apply international humanitarian law that is "beyond any doubt customary law." *Tadic*, Opinion and Judgment (Trial Chamber) ¶ 662 (citing Report of the Secretary General Pursuant to Paragraph 2 of Security Council Resolution 808 (1993), U.N. Doc. S/25704 ¶ 34); *see* Statute of the International Tribunal for Rwanda ("ICTR Statute"), art. 1 (Tribunal "shall have the power to prosecute persons responsible for serious violations of international humanitarian law"), available at http://www.ictr.org.

**22.** *See* United Nations Security Council Resolution 827 (1993), reaffirming United Nations

Security Council Resolution 713 (1991) and approving the Report of the Secretary General (S–25T04 and Add. 1) made pursuant to paragraph 2 of United Nations Security Council Resolution 808 (1993); *see Tachiona v. Mugabe*, 169 F.Supp.2d. 259, 279 n. 78 (S.D.N.Y.2001) ("The Yugoslavia and Rwandan Tribunals, though creatures of U.N. Security Council resolutions, both have been legitimized, by way of implementing legislation, as playing an important role in the legal machinery of the United States for the Tribunals' specified purposes. As such, the Tribunals bear the imprimatur of both international consensus and domestic implementing legislation") (citation omitted).

**23.** *See, e.g., In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir.), *cert. denied*, 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995) (torture violates "specific, universal and obligatory standard"); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir.), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123

The prohibition of torture under customary international law is evidenced by, among other things, specific prohibitions on its use in numerous international human rights treaties; including the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention").[24] The Torture Convention defines torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[25]

■ Plaintiffs have established that defendant Vuckovic was responsible for torturing each of them, as defined under international law. The incidents described in the findings above demonstrate that defendant Vuckovic perpetrated, or was complicit in, severe beatings of each plaintiff, which caused each plaintiff severe physical pain and suffering:

- Vuckovic beat plaintiff Mehinovic at both the police station and the TO warehouse. These beatings included kicks and blows to the face, genitals, and other areas. They disfigured Mehinovic and may have broken his ribs and caused him nearly to lose consciousness and to be unable to eat. Vuckovic also was present during, and took pleasure in, a torture session led

L.Ed.2d 444 (1993) (prohibition against official torture has attained status of *jus cogens* norm); *Filartiga*, 630 F.2d at 887 (holding that former Inspector General of Police in Asuncion, Paraguay, could be held liable under the ATCA for the torture and consequent death of a seventeen-year-old boy); *Mushikiwabo v. Barayagwiza*, 1996 WL 164496 (S.D.N.Y. April 9, 1996) (Rwandan Hutu leader liable for torture and summary execution committed as part of genocidal campaign); *Paul v. Avril*, 901 F.Supp. 330, 335 (S.D.Fla. 1994) (former military leader of Haiti liable under the ATCA for torture of six Haitian citizens by soldiers under his command and control); *Xuncax v. Gramajo*, 886 F.Supp. 162, 184 (D.Mass.1995) ("Numerous federal court decisions and an ever-growing number of international agreements and conventions have established beyond question that the use of official torture is strictly prohibited by the most fundamental principles of international law")(footnote omitted).

**24.** G.A. Res. 39/46, 39 U.N. GAOR, Supp. No. 51, at 197, U.N. Doc A/39/51 (Dec. 10, 1984) (entered into force June 26, 1987) (ratified by the United States Oct. 21, 1994); *see also,* Universal Declaration of Human Rights [hereinafter "Universal Declaration"], G.A. Res. 217A (III), U.N. GAOR, at 71, art. 5, U.N.

Doc. A/810 (1948) ("No one shall be subjected to torture...."); S.Rep. No. 249–102, at 3 (1991) ("Official torture and summary execution violate standards accepted by virtually every nation. This universal consensus condemning these practices has assumed the status of customary international law"); International Covenant on Civil and Political Rights [hereinafter "ICCPR"], G.A. Res. 2200 A(xx1), 21 U.N. GAOR, Supp. No.16, at 52, art. 7, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 717 (Dec. 16, 1966) (entered into force Mar. 23, 1976) (ratified by the United States Sept. 1992); European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, Nov. 26, 1987, 27 I.L.M. 1154 (entered into force Feb. 1, 1989); European Convention for the Protection of Human Rights and Fundamental Freedoms [hereinafter "European Convention"], Nov. 4, 1950, art. 3, 213 U.N.T.S. 222 (entered into force Sept. 3, 1953).

**25.** This definition is substantially similar to the definition used in the TVPA, *see* TVPA § 3(b)(1), which is intended to "carry out the intent" of the Torture Convention. S.Rep. No. 249–102, at 3.

by police chief Todorovic in which Todorovic broke Mehinovic's finger.

- Vuckovic beat plaintiff Bicic repeatedly on numerous occasions, using revolvers, rifles, and other instruments. On one occasion, Vuckovic presided over a beating during which another soldier rode on Bicic's back and hit him on the head with a baton during a game of "horse." Plaintiff Bicic identified Vuckovic as one of the participants in the teeth-pulling incident at the elementary school.

- Plaintiff Hadzialijagic also suffered many beatings at Vuckovic's hands, including a long and nightmarish beating that included being hit while hanging upside down from a rope until he almost lost consciousness, and being kicked in the face and torso while kneeling or lying on the ground. Vuckovic apparently nearly killed Hadzialijagic during this incident.

- Vuckovic hit plaintiff Subasic and kicked him in the stomach with his military boots while Subasic was forced into a kneeling position, causing Subasic to suffer severe pain.

 Vuckovic also caused or participated in the plaintiffs' mental torture. Mental torture consists of "prolonged mental harm caused by or resulting from: the intentional infliction or threatened infliction of severe physical pain or suffering; ... the threat of imminent death; or the threat that another person will imminently be subjected to death, [or] severe physical pain or suffering." As set out above, plaintiffs noted in their testimony that they feared that they would be killed by Vuckovic during the beatings he inflicted or during games of "Russian roulette." Each plaintiff continues to suffer long-term psychological harm as a result of the ordeals they suffered at the hands of defendant and others.

 Plaintiffs have shown that defendant Vuckovic acted with the intent required to establish that his acts constituted torture. Vuckovic's anti-Muslim statements, and the entire context in which the beatings occurred, evidence the fact that the defendant beat and threatened plaintiffs for discriminatory reasons.[26] Plaintiffs have also established that the acts of defendant Vuckovic were carried out with the intent of intimidating or terrorizing them because of their ethnicity, pursuant to the Bosnian Serb government's campaign of ethnic cleansing.

 Finally, the beatings carried out by Vuckovic and his accomplices were clearly perpetrated, instigated, and acquiesced in, by persons acting in an official capacity as part of the police or military forces of *Republika Srpska*.[27] Vuckovic himself was a soldier in a unit tied to and supported by the Bosnian Serb and Serbian governments. He often carried out beatings with other soldiers. The beatings inflicted by Vuckovic all were committed in official or designated detention facilities, guarded by Bosnian Serb or Serbian police or soldiers. Without their permission or acquiescence, and that of those in the political and military hierarchy above him, Vuckovic could not have perpetrated abus-

---

26. The ICTY has held with respect to the interpretation of the Torture Convention: "[T]here is no requirement that the conduct must be solely perpetrated for a prohibited purpose. Thus, in order for this requirement to be met, the prohibited purpose must simply be part of the motivation behind the conduct and need not be the predominating or sole purpose." ICTY, *Prosecutor v. Delalic*, Case No. IT–96–21, Judgment (Trial Chamber II, November 16, 1998) ¶ 470.

27. Officials purporting to act for *Republika Srpska* may be considered to have acted in an official capacity in light of its *de facto* governing authority. *See Kadic*, 70 F.3d at 244–45.

es against plaintiffs. Plaintiff Subasic described frequently hearing guards scheduling beatings in advance. The fact that the beatings carried out by Vuckovic and others were routine, daily occurrences at these facilities also indicates that the beatings were, in fact, ordered, authorized, and perpetrated as part and parcel of official policy.

For these reasons, defendant Vuckovic is liable for torture under the ATCA.

## 2. *TVPA*

The TVPA also provides a cause of action for official torture. The TVPA provides in relevant part:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation—(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual[.]

TVPA § 2(a).

■■■ As set out in the section above, defendant Vuckovic clearly committed abuses against plaintiffs under official authority. In light of the *de facto* governmental authority of the *Republika Srpska,* under which Vuckovic served as a soldier, and the control exerted over it by the Serbian government, Vuckovic may be considered also to have been acting under the authority of a "foreign nation." [28] Additionally, as the definition of torture under the TVPA closely follows the definition of torture under the Torture Convention in all relevant respects,[29] for the same reasons as above, Vuckovic's actions also constitute torture under the TVPA. Accordingly, defendant Vuckovic also is liable to plaintiffs for torture under the TVPA.[30]

## B. *Cruel, Inhuman or Degrading Treatment*

■■■ Cruel, inhuman, or degrading treatment is a discrete and well-recognized violation of customary international law and is, therefore, a separate ground for liability under the ATCA. *Abebe–Jira,* 72 F.3d at 847; *Estate of Cabello v. Fernandez–Larios,* 157 F.Supp.2d 1345, 1362 (S.D.Fla.2001); *Xuncax,* 886 F.Supp. at 187. In particular, the Eleventh Circuit

---

**28.** *See Kadic,* 70 F.3d at 244–46 ("The customary international law of human rights, such as the proscription of official torture, applies to states without distinction between recognized and unrecognized states") (citation omitted); *Tadic,* Judgment (Appeals Chamber) ¶¶ 82–162.

**29.** The TVPA defines torture as

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind[.]

TVPA, § 3(b)(1).

**30.** While the TVPA requires a plaintiff to exhaust "adequate and available" remedies in the country where the conduct occurred, TVPA § 2(b), the burden is on defendant to raise non-exhaustion. *Hilao v. Estate of Marcos,* 103 F.3d 767, 778 n. 5 (9th Cir.1996). Defendant has not met that burden here. Even if the exhaustion requirement were applicable, testimony by plaintiffs' expert Diane Paul and other documentation in evidence regarding the absence of any efforts to bring war criminals to justice clearly demonstrates that any remedies for plaintiffs in *Republika Srpska,* would have been "unattainable, ineffective, inadequate, or obviously futile." S.Rep. No. 249–102 at 9–10. As the Second Circuit observed in *Kadic:* "[I]t seems evident that the courts of the former Yugoslavia, either in Serbia or war-torn Bosnia, are not now available to entertain plaintiffs' claims. . . ." *Kadic,* 70 F.3d at 250.

and other courts have recognized cruel, inhuman, or degrading treatment as a violation of customary international law, at least to the extent that the conduct also would be prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution. *Abebe–Jira,* 72 F.3d at 847; *Cabello,* 157 F.Supp.2d at 1362; *Paul,* 901 F.Supp. at 330; *Xuncax,* 886 F.Supp. at 187–89.[31] These courts, accordingly, have allowed defendants to be held liable for the infliction of cruel, inhuman or degrading treatment. International instruments and decisions also recognize cruel, inhuman and degrading treatment as a distinct violation of international law.[32]

■■■ Generally, cruel, inhuman, or degrading treatment includes acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the level of "torture" or do not have the same purposes as "torture." [33] A number of Vuckovic's actions against plaintiffs specifically and uniquely constitute cruel, inhuman and degrading treatment under international law. Apart from the acts noted above which constituted torture, Vuckovic carried out certain

acts intended specifically to degrade and humiliate plaintiffs.

- Plaintiff Hadzialijagic is permanently scarred with a crescent, a recognized Muslim symbol, that Vuckovic carved into his forehead with a knife during one incident. During this same incident, Vuckovic forced Hadzialijagic to carry him like a horse, ordered him to lick his own blood off Vuckovic's boots, and dunked his head in a bowl used as a toilet.

- Vuckovic shouted anti-Muslim epithets at plaintiff Mehinovic while beating him, and then forced him to lick his own blood off the police station walls while Vuckovic laughed. He also participated in the "game" in which Mehinovic was forced to run in a circle while Vuckovic or other guards swung wooden planks at them.

- Vuckovic also subjected Bicic to the game of "horse," beating him and shouting anti-Muslim epithets while forcing Bicic to carry Vuckovic on his back.

- Plaintiff Subasic described how the feeling of helplessness he suffered at

**31.** This Court has previously held that cruel, inhuman and degrading treatment, in addition to torture, is contrary to settled international law and a proper ground for liability under the ATCA. *Abebe–Jiri v. Negewo,* 1993 WL 814304 (N.D.Ga.)(Tidwell, J.), *aff'd,* 72 F.3d 844 (11thCir.1996).

**32.** ICCPR, art. 7 ("No one shall be subjected to torture *or* to cruel, inhuman, or degrading treatment or punishment.") (emphasis added); Universal Declaration, art. 5 (same); American Convention on Human Rights, 1144 U.N.T.S. 23 (entered into force July 18, 1978), art. 5 [hereinafter "American Convention"] (same).

**33.** Restatement (Third) of Foreign Relations Law § 702, Reporters' Note 5 (1987). *See also* Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 101 S.

Exec. Rep. 30, at 13 (1990) ("[T]orture is at the extreme end of cruel, inhuman or degrading treatment"); *Ireland v. United Kingdom,* 25 Eur. Ct. H.R. (ser.A) at 65–67, ¶ 167 (1978); Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. GAOR, Supp. No. 34, at 91, art. 1, U.N. Doc. A/10034 (1975) ("Torture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment"); J.H. Burgers & H. Danelius, *The U.N. Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* 150 (1988) ("Unlike in the definition of torture . . . the purpose of the act is irrelevant in determining whether or not the act should be considered to constitute cruel, inhuman or degrading treatment").

being beaten and kicked by Vuckovic while forced on his hands and knees was as extreme as the physical pain Vuckovic caused him to endure.

Vuckovic typically carried out these beatings and humiliations in front of others, exacerbating the humiliation and degradation of the ordeals. Additionally, each was forced to observe the suffering of their friends and neighbors, another form of inhumane and degrading treatment.

In light of the above, defendant Vuckovic is liable for acts of cruel, inhuman, or degrading treatment against each plaintiff.

## C. *Arbitrary Detention*

 Arbitrary detention is a violation of customary international law and thus actionable under the ATCA. *See Alvarez*, 266 F.3d at 1052–53; *Fernandez–Roque v. Smith*, 622 F.Supp. 887, 903 (N.D.Ga.1985); *Forti*, 672 F.Supp. at 1541. "Arbitrary detention is cited as a violation of international law in all comprehensive international human rights instruments." [34] Generally, detention is arbitrary if "it is not pursuant to law; it may be arbitrary also if it is incompatible with the principles of justice or with the dignity of the human person." [35] More specifically, arbitrary detention is the detention of a person in an official detention facility or in any other place, without notice of charges and failure to bring that person to trial within a reasonable time. *Id.; see Fernandez–Roque*, 622 F.Supp. at 903 (indefinite detention of Cuban refugees without periodic hearings violates customary international law); *see also Soroa–Gonzales v. Civiletti*, 515 F.Supp. 1049, 1061, n. 18. (N.D.Ga.1981)

(indefinite detention of Cuban refugees would violate customary international law if question were properly before court).

 Here, plaintiffs each were detained without ever being advised of any charges against them. There is no evidence that any was ever brought before a court or ever tried for any offense, or that the detentions were made pursuant to any law. Additionally, each was detained for prolonged periods of time with defendant's knowledge and participation.[36]

- Plaintiff Mehinovic was detained for more than six months in Bosanski Samac alone before being transferred to concentration and labor camps in other areas for an additional two years.

- Plaintiff Bicic was detained in Bosanski Samac, including a brief period in barracks outside the town, until at least four and a half months after the date of his initial detention there.

- Plaintiff Hadzialijagic was detained for at least one month and apparently some substantial period beyond that. The record indicates that Hadzialijagic was detained several days after the Serb takeover of Bosanski Samac on April 17, 1992, and was among the group of Bosanski Samac prisoners returned to the town and held at the elementary school on or about March 13, 1992, after brief transfers to nearby military barracks. Hadzialijagic testified to repeated beatings, including the particularly brutal incident perpetrated by Vuckovic, at the ele-

---

**34.** Restatement (Third) of Foreign Relations Law § 702, Reporters' Note 6 (1987) (citing, *inter alia*, Universal Declaration, art. 9; ICCPR, art 9; European Convention, art. 5; American Convention, art. 7).

**35.** Restatement (Third) of Foreign Relations Law, § 702, comment h (1987).

**36.** The length of time plaintiffs were detained is clearly sufficient to support their claims for arbitrary detention. *See Alvarez*, 266 F.3d at 1052–53 (24–hour detention); *Eastman Kodak v. Kavlin*, 978 F.Supp. 1078, 1092–94 (S.D.Fla.1997) (8–10 day detention).

mentary school, indicating some period of detention beyond March 13.

- Plaintiff Subasic was detained in Bosanski Samac, including the brief period in nearby military barracks, for approximately six months, and then transferred to concentration camps where he remained another 20 months.

Defendant Vuckovic was plainly aware, or at minimum should have been aware, that plaintiffs were detained arbitrarily. Vuckovic routinely carried out beatings and other abuses against plaintiffs and others during his visits to the elementary school and other detention facilities, and even lived just outside the school while several of the plaintiffs were detained there. Vuckovic directly and indirectly participated in plaintiffs' continued unlawful detention by keeping them forcibly restrained during torture sessions in which he participated, and through his actions against plaintiffs aiding and abetting others who kept plaintiffs in detention.

Based on the above, defendant Vuckovic may be held liable for the arbitrary detention of plaintiffs.

### D. *War Crimes*

 Acts of torture, inhuman treatment, and arbitrary detention of civilians committed in the course of hostilities violate the international law of war as codified in the Geneva Conventions and, hence, are a proper basis for liability under the ATCA. *Kadic*, 70 F.3d at 242–43.[37] Such acts, whether committed in an international armed conflict or a non-international armed conflict, violate customary interna-

tional law and are enforceable under the ATCA. *Id.* As set forth below, the defendant has committed violations of customary international humanitarian law and is liable to plaintiffs for these violations.

### 1. *Common Article 3*

Common Article 3, which is substantially identical in each of the four Geneva Conventions, applies to "armed conflict[s] not of an international character" and binds "each Party to the conflict . . . to apply, as a minimum, the following provisions":

> Persons taking no active part in the hostilities . . . shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.
>
> To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>
> (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
>
> (b) taking of hostages;
>
> (c) outrages upon personal dignity, in particular humiliating and degrading treatment;
>
> (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court. . . .

*Kadic*, 70 F.3d. at 243 (quoting Geneva Convention I art. 3(1)). "Thus, under the law of war as codified in the Geneva Con-

---

**37.** *See also* Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T.S. 3114, 75 U.N.T.S. 31 ("Convention I"); Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T.S. 3217, 75 U.N.T.S. 85 ("Convention II"); Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Convention III"); Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T.S. 3516, 75 U.N.T.S. 287 ("Convention IV"). The United States is party to all four Geneva Conventions. *See* U.S. Dep't of State; Treaties in Force, at 428–32.

ventions, all 'parties' to a conflict—which includes insurgent military groups—are obliged to adhere to these most fundamental requirements of the law of war." *Id.* (footnote omitted).

■ Plaintiffs have shown that they are protected persons under Common Article 3 as they are and were civilians and non-combatants. Plaintiffs have also shown that defendant Vuckovic's conduct constituted violence to life and person in the form of torture and cruel treatment, outrages upon the personal dignity of the plaintiffs, and the passing of sentences against plaintiffs without previous judgment. Defendant Vuckovic is liable to plaintiffs for these violations of Common Article 3 and the customary international humanitarian norms embodied in those provisions.

### 2. *Grave Breaches*

The Court finds that the "grave breaches" provisions of the Geneva Conventions [38] are applicable to the conduct of the defendant and define the bounds of customary international law concerning attacks on civilians and other protected persons during periods of international armed conflict.[39] These provisions, found in each of the Geneva Conventions, are also codified in Article 2 of the ICTY Statute as follows:

The International Tribunal shall have the power to prosecute persons committing or ordering to be committed grave breaches of the Geneva Conventions of 12 August 1949, namely the following acts against persons or property protected under the provisions of the relevant Geneva Convention:

(a) willful killing;

(b) torture or inhuman treatment, including biological experiments;

(c) willfully causing great suffering or serious injury to body or health;

(d) extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly;

(e) compelling a prisoner of war or a civilian to serve in the forces of a hostile power;

(f) willfully depriving a prisoner of war or a civilian of the rights of fair and regular trial;

(g) unlawful deportation or transfer or unlawful confinement of a civilian;

(h) taking civilians as hostages.

■ Plaintiffs have shown that they are protected persons under the grave breaches provisions as they were "in the hands of a Party to the Conflict or Occupying Power of which they are not nationals." [40] As set out above, plaintiffs also

---

**38.** Convention I, art. 50; Convention II, art. 51; Convention III, art. 130; Convention IV, art. 147.

**39.** The ICTY has concluded that the conflict in the former Yugoslavia was, for all relevant periods, international in character. *Tadic,* Judgment (Appeals Chamber), ¶ 170–71; *Delalic,* Judgement (Appeals Chamber, February 20, 2001), ¶ 6–50. The testimony of plaintiffs' expert Diane Paul further supports this proposition. Therefore, the grave breaches provisions clearly apply to the defendant's conduct. Moreover, the ICTY has held that Common Article 3 prescribes "minimum mandatory rules applicable to internal armed conflicts

... [that] reflect elementary considerations of humanity applicable under customary international law to any armed conflict, whether it is of an internal or international character. Therefore, at least with respect to the minimum rules in Article 3, the character of the conflict is irrelevant." *Tadic,* Decision on the Defence Motion on Jurisdiction (Appeals Chamber, Oct. 2, 1995) (citation omitted).

**40.** See *Tadic,* Judgment (Appeals Chamber) ¶ 164–67 (holding that Bosnian Serbs operated as organs of another state and, therefore, that the Bosnian Muslim victims were protected persons within the meaning of the grave breaches provisions).

have shown that defendant Vuckovic committed the following grave breaches, in addition to that conduct which constitutes a violation of Common Article 3: inhuman treatment, willfully causing great suffering or serious injury, and unlawful confinement. Defendant Vuckovic is liable to plaintiffs for these grave breaches of the Geneva Conventions, and the customary international humanitarian norms embodied in these provisions.

▆▆▆▆ Notably, under international law, "inhuman treatment" includes "not only acts such as torture and intentionally causing great suffering or inflicting serious injury to body, mind or health but also extends to other acts contravening the fundamental principle of humane treatment, in particular those which constitute an attack on human dignity."[41] Similarly, "willfully causing great suffering or serious injury to body or health" includes injury to "mental health" and "includes those acts which do not fulfill the conditions set for the characterization of torture, even though acts of torture may also fit the definition given."[42] Therefore, it is clear that those facts which prove defendant Vuckovic's violation of the customary international legal prohibition against cruel, inhuman and degrading treatment during armed conflict also make out a violation of

the laws of war under the grave breaches provisions of the Geneva Conventions. Likewise, those facts which prove plaintiffs' arbitrary detention claim, described herein, also show a violation of the "unlawful confinement" portion of the grave breaches provisions.

### E. Crimes Against Humanity

Crimes against humanity have been recognized as a violation of customary international law since the Nuremberg trials and therefore are actionable under the ATCA.[43] Crimes against humanity were first codified in the Charter of the International Military Tribunal (IMT), which authorized the criminal trials at Nuremberg. The IMT Charter defined crimes against humanity as:

> murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of, or in connection with, any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.[44]

▆▆▆ Since the Nuremberg trials, the definition of crimes against humanity under customary international law has

**41.** ICTY, *Prosecutor v. Blaskic,* Case No. IT–95–14, Judgment (Trial Chamber I, March 3, 2000) ¶ 155 (citing *Delalic,* Judgment (Trial Chamber) ¶ 544).

**42.** *Id.* ¶ 156 (citing *Delalic,* Judgment (Trial Chamber) ¶ 511).

**43.** *Cabello,* 157 F.Supp.2d at 1360 (finding that "the ruling of the Nuremberg Tribunal memorialized the recognition of 'crimes against humanity' as customary international law"). *See also Tadic,* Opinion and Judgment (Trial Chamber) ¶ 623. (Since Nuremberg, "the customary status of the prohibition against crimes against humanity and the attribution of individual criminal responsibility for

their commission have not been seriously questioned").

**44.** Charter of the International Military Tribunal, Aug. 8, 1945, art. 6(c), 59 Stat. 1546, 1547, E.A.S. No. 472, 82 U.N.T.S. 284 (hereinafter "IMT Charter"). In 1946, the General Assembly endorsed the principles of international law recognized in the IMT Charter. *See* G.A. Res. 95, 1 U.N. GAOR, at 1144, U.N. Doc. A/236 (1946); *see also* Convention on the Non–Applicability of Statutory Limits to War Crimes and Crimes Against Humanity, Nov. 26, 1968, art. 1(b), 660 U.N.T.S. 195, *reprinted in* 8 I.L.M. 68 (1969) (adopting Nuremberg definition of crimes against humanity except for in connection with aggressive war).

evolved significantly. Importantly, while the IMT Charter formerly required a nexus between the wrongful acts and an armed conflict, the definition of crimes against humanity no longer requires any connection to an international or internal armed conflict.[45] Additionally, the scope of enumerated offenses has been expanded to include, *inter alia,* imprisonment, rape, and torture.[46]

■ The Rome Statute of the International Criminal Court defines crimes against humanity as any of certain enumerated acts that are prohibited by international law "when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack." [47] These acts include murder, extermination, imprisonment or other severe deprivation of physical liberty, torture, rape or sexual violence, persecution against any identifiable group on the basis of racial, political, ethnic, cultural or religious status and other inhumane acts.[48]

■ Although the Rome Statute's definition of crimes against humanity may be narrower in scope than the customary law definition of crimes against humanity today, the evidence before this Court clearly demonstrates that the defendant has committed acts which constitute crimes against humanity under any of the applicable definitions enforceable under the ATCA.

Plaintiffs have shown that the acts of the defendant described herein, including torture, imprisonment, and cruel, inhuman and degrading treatment, were committed in furtherance of the Bosnian Serb government's policy of "ethnic cleansing." As documented in numerous reports by governmental and non-governmental organizations, by the ICTY, and as described in the testimony of the plaintiffs and plaintiffs' expert witness Diane Paul, the Bosnian Serb campaign constituted a widespread and systematic attack on and persecution of Bosnian Muslims and other groups because of their ethnicity and religion.

■ Defendant's actions were consistent with the pattern and practice of abuses against Bosnian Muslims and demonstrate that he was well aware of being part of a campaign of ethnic cleansing that was both widespread and systematic.[49] Vuckovic was necessarily aware, by virtue of his residence in Bosanski Samac and visits to *ad hoc* detention facilities holding Bosnian Muslims and Croats, that civilians from these groups had been detained pursuant to a plan implemented· upon the Bosnian Serb attack on the town, and that

---

**45.** *See* Rome Statute of the International Criminal Court [hereinafter "Rome Statute"], adopted by the United Nations Diplomatic Conference on the Establishment of an International Criminal Court on 17 July 1998, art. 7; ICTY Statute, art. 5; *Tadic,* Judgment (Appeals Chamber) ¶ 249; ICTR Statute, art 3.

**46.** *Id.; see also* Control Council Law No. 10, art. II(1)(c) (Dec. 20, 1945).

**47.** Rome Statute, art. 7. In *Prosecutor v. Furundzija,* Case No. IT–95–17/1, Judgment (Trial Chamber II, December 19, 1998) ¶ 227, the ICTY noted that the Rome Statute, though not yet entered into force, was adopted by an overwhelming majority of the States attending the Rome Diplomatic Conference and was

substantially endorsed by the U.N. General Assembly's Sixth Committee, and therefore in many areas "may be regarded as indicative of the legal views, i.e. *opinio juris* of a great number of States."

**48.** *Id.; see also* ICTY Statute, art. 5; ICTR Statute, art. 3.

**49.** The U.S. Department of State noted in its 1992 *Report on Human Rights Practices* for Bosnia and Herzegovina that the "policy" of "so-called ethnic cleansing, was practiced by Serbian forces in Bosnia on a scale that dwarfs anything seen in Europe since Nazi times." 1992 *Report on Human Rights Practices,* at 719, Plaintiff's Exhibit 22.

others from these groups had been displaced from the town. Vuckovic even apparently lived in the home of a Muslim family displaced by the Bosnian Serb assault. Vuckovic directly and even sadistically participated in, aided, and observed horrific acts of brutality committed against defenseless civilian detainees whose only crime was that they were members of the Muslim ethnic group in Bosanski Samac. These acts were at the core of the definition of crimes against humanity.[50]

### F. Genocide

Genocide unquestionably constitutes a violation of customary international law.[51]

---

**50.** Defendant Vuckovic is liable for the commission of these acts even if he was not aware that his conduct might rise to the level of a crime against humanity. International law provides that an actor is responsible if he knew or should have known that his conduct would contribute to a widespread or systematic attack against civilians. *See* ICTR, *Prosecutor v. Kayeshima,* Case No. ICTR–95–1–T, Judgment (Trial Chamber, May 21, 1999) ¶ 133 (noting that defendant must have "actual or constructive knowledge" of a widespread or systematic attack); ICTY, *Prosecutor v. Kordic,* Case No. IT–95–14/2, Judgment (Trial Chamber III, Feb. 26, 2001) ¶ 185 (same; quoting *Kayeshima* ). Plaintiffs have shown that the "ethnic cleansing" campaign necessarily was widespread and common knowledge to all persons in areas affected by it, such that Vuckovic at a minimum should have been aware that his actions would contribute to a widespread or systematic campaign or attack against a civilian population.

**51.** *Kadic,* 70 F.3d at 241–42. *See also Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1180 (D.C.Cir.1994) ("One need not pause long before concluding that the international community's denunciation of both genocide and slavery are accepted norms of customary international law and, in particular, are *jus cogen* norms"); *Siderman de Blake,* 965 F.2d at 715; *Beanal v. Freeport–McMoRan, Inc.,* 969 F.Supp. 362, 372 (E.D.La.1997); *Xuncax,* 886 F.Supp. at 187 n. 35.

**52.** 78 U.N.T.S. 277 in U.S. State Department of State, Treaties in Force 345 (1994) (entered

The Second Circuit in *Kadic* relied upon the Convention on the Prevention and Punishment of the Crime of Genocide[52] to find a "specific articulation of the prohibition against genocide in international law."[53]

■ The Genocide Convention absolutely prohibits genocide "whether committed in time of peace or in time of war."[54] Subsequent international agreements, resolutions, and court decisions have reaffirmed its absolute prohibition.[55] "Genocide" is defined as

any of the following acts committed with intent to destroy, in whole or in part, a

---

into force Jan. 12, 1951) [hereinafter "Genocide Convention"].

**53.** *Kadic,* 70 F.3d at 241; *see also The Genocide Convention Implementation Act of 1987,* 18 U.S.C. § 1901 (1988), which criminalizes genocide and makes it actionable under domestic U.S. law.

**54.** Genocide Convention, art. 1. The Genocide Convention also states explicitly that it is intended to codify existing customary law. The parties *"confirm* that genocide ... is a crime under international law which they undertake to prevent and to punish." *Id.* (emphasis added).

**55.** *See, e.g.,* Rome Statute, art. 5 (making genocide a core crime within the jurisdiction of the Court); Convention on the Non–Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity. Advisory Opinion, Reservations to the Convention on Genocide Case, 1951 I.C.J. Rep. 15, 23; G.A. Res. 96(I), U.N. GAOR, U.N. Doc. A/64/Add.1 (1946) (affirming that genocide is a crime under international law); G.A. Res. 180(II), 2 U.N. GAOR, U.N. Doc. A/519 (1947) (same); Principles of International Cooperation in the Detection, Arrest, Extradition, and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074 (Dec. 3, 1973); 3 *Trials of War Criminals Before the Nuremberg Military Tribunals* 983 (1951).

national, ethnical, racial or religious group, as such:

(a) Killing members of the group;

(b) Causing serious bodily or mental harm to members of the group;

(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

(d) Imposing measures designed to prevent births within the group;

(e) "Forcibly transferring children of the group to another group" when they are "committed with intent to destroy, in whole or in part, a national, ethnical, racial, or religious group, as such".[56]

Notably, in the *Kadic* decision, the Second Circuit affirmed that "the proscription of genocide has applied equally to state and non-state actors." [57]

The evidence before the Court regarding the intent and nature of the attacks and abuses against civilians in Bosnia, and in Bosanski Samac in particular, and defendant's knowledge and willing participation in this plan, appears to support a finding that the defendant committed ge-

nocide under this definition. However, in light of the court's assessment of liability for crimes against humanity and other grave human rights abuses, the Court does not reach this issue.

## VIII. *Liability for Aiding and Abetting*

In addition to bearing direct responsibility for abuses against plaintiffs, defendant Vuckovic also may be held liable for aiding and abetting others in acts against plaintiffs that violate customary international law. Plaintiffs have demonstrated that Vuckovic acted in concert with others in committing many of the abuses suffered by plaintiffs.

United States courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law.[58] Similarly, the Senate report on the TVPA notes that that statute is intended to apply to those who "ordered, abetted, or assisted" in the violation.[59]

■■■ Principles of accomplice liability are well-established under international law. Relevant international conventions

---

**56.** *Kadic,* 70 F.3d at 241 (quoting Genocide Convention, art. II).

**57.** *Id.* at 242 ("Appellants' allegations … clearly state a violation of the international law norm proscribing genocide, regardless of whether Karadzic acted under color of law or as a private individual"). *See also* Genocide Convention, art. 4 ("[P]ersons committing genocide … shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals"); Restatement (Third) of Foreign Relations Law of the United States, Pt. II Introductory Note (1987) ("[I]ndividuals may be held liable for offenses against international law, such as piracy, war crimes, or genocide"). Genocide is a crime under international and United States law whether perpetrators are "private individuals, public officers or statesmen." G.A. Res.

96(1), I U.N. GAOR, at 188–89, U.N. Doc. A/64/Add.1 (1946).

**58.** *Abebe–Jira,* 72 F.3d at 845–48 (affirming verdict for torture and cruel, inhuman or degrading treatment where defendant supervised or participated with others in "some of the acts of torture" against plaintiffs); *Carmichael v. United Technologies Corp.,* 835 F.2d 109, 113–114 (5th Cir.1988) (ATCA jurisdiction over "private parties who conspire in, or *aid or abet,* official acts of torture by one nation against the citizens of another nation") (emphasis added); *National Coalition Government of Union of Burma v. Unocal, Inc.,* 176 F.R.D. 329, 348 (C.D.Cal.1997) (recognizing liability for violations of customary international law may be based on "joint action" by private party with state).

**59.** *See* S.Rep. No. 249–102, at 8–9 and n. 16.

explicitly provide that those who assist in the commission of acts prohibited by international law may be held individually responsible.[60] Article 7(1) of the ICTY Statute, for example, states that "[a] person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime referred to in Articles 2 to 5 of the present statute [grave breaches of the Geneva Conventions of 1949, violations of laws or customs of war, genocide or crimes against humanity] shall be individually responsible for the crime." [61]

The ICTY has held that secondary liability under Article 7(1) requires both an *actus reus* and *mens rea* distinct from the acts and intent of the principal.[62] Under the Tribunal's jurisprudence, the *actus reus* of aiding and abetting requires "practical assistance, encouragement or moral support which has a substantial effect on the perpetration of the crime." [63] Notably, this formulation does not require the tangible assistance of the aider and abettor.[64] As to *mens rea*, the ICTY has found that it is not necessary for the accomplice to share the same wrongful intent as the principal. Rather, it is sufficient that the accomplice knows that his or her actions will assist the perpetrator in the commission of the crime.[65]

In this case, plaintiffs have demonstrated that defendant Vuckovic aided and abetted Serb military and political forces in committing genocide, war crimes, torture and other wrongful acts against plaintiffs. For example, he participated in acts of torture against plaintiffs in cooperation with the Bosnian Serb Chief of Police Todorovic at the Bosanski Samac police station. Plaintiffs testified that Vuckovic perpetrated acts of abuse against plaintiffs together with other Bosnian Serb soldiers and police officials at the TO warehouse, jointly carrying out torture and humiliations of plaintiffs and taking turns beating them. Plaintiff Bicic identified Vuckovic as one of those participating in the teeth-pulling incident described above. The defendant also participated in the unlawful detention of plaintiffs in these facilities. The evidence suggests that in doing so, Vuckovic both provided assistance and encouragement to those who directly perpetrated acts of torture and abuse against plaintiffs, and that he knew that his own participation in and encouragement of these actions would assist others in committing these acts. Therefore, defendant Vuckovic is "responsible under international law for his own acts, [and] for acts which he directed, ordered, aided, abetted or participated in . . . ." [66]

The evidence demonstrated that Vuckovic not only participated directly in committing human rights violations against the plaintiffs and others detained with them, but also that the defendant actively encouraged, aided, and even supervised the commission of human rights abuses by other guards at the detention facilities at which the plaintiffs were held. By his actions and words, Vuckovic associated himself with the brutality of other guards who also violated the plaintiffs' rights and caused them serious injuries. Vuckovic is also responsible for the actions of his associates.

---

60. *See, e.g.,* Rome Statute, art. 25; IMT Charter, art. 6; ICTY Statute, art 7(1); ICTR Statute, art. 6(1).

61. ICTY Statute, art. 7(1).

62. *Furundzija,* Judgment (Trial Chamber), ¶¶ 192–249.

63. *Id.* ¶ 235.

64. *Id.* ¶ 232.

65. *Id.*

66. *Abebe–Jiri v. Negewo,* 1993 WL 814304 at *4.

## IX. *Municipal Law Claims*

Plaintiffs have shown that defendant Vuckovic committed the following torts under the laws of the State of Georgia: assault and battery, false imprisonment, intentional infliction of emotional distress, and conspiracy to commit those torts.[67]

### A. *Assault and Battery*

 Under Georgia law, "[a] physical injury done to another shall give a right of action to the injured person, whatever may be the intention of the person causing the injury, unless he is justified under some rule of law." O.C.G.A. § 51–1–13 (2000). "Any violent injury or illegal attempt to commit a physical injury upon a person is a tort for which damages may be recovered." O.C.G.A. § 51–1–14 (2000). Defendant Vuckovic is liable for assault and battery for committing unjustified acts of physical violence which constituted harmful and offensive contacts. *See Greenfield v. Colonial Stores*, 110 Ga.App. 572, 139 S.E.2d 403, 405–06 (1964). The defendant's intention in committing such injuries does not affect his liability. *See Hendricks v. Southern Bell Tel. & Tel. Co.*, 193 Ga.App. 264, 387 S.E.2d 593, 594–95 (1989). Plaintiffs have shown that defendant Vuckovic committed extensive physical injuries against all of the plaintiffs, without their consent, and in a harmful and offensive manner. Therefore, Vuckovic is liable to plaintiffs under Georgia law for assault and battery.

### B. *False Imprisonment*

 False imprisonment is "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51–7–20 (2000). Plaintiffs need not show malice or lack of probable cause to state a claim for false imprisonment. *Lowe v. Turner*, 115 Ga.App. 503, 154 S.E.2d 792, 795 (1967). A detention need not consist of physical restraint, but may arise out of words, acts, gestures or the like, which induce a reasonable apprehension that force will be used if the plaintiff does not submit; and it is sufficient if they operate upon the will of the person threatened and result in a reasonable fear of personal difficulty or personal injury. *Kemp v. Rouse–Atlanta, Inc.* 207 Ga.App. 876, 429 S.E.2d 264, 268 (1993). Each of the plaintiffs was detained without an arrest warrant and without being told of the charges against him. Plaintiffs have shown that defendant Vuckovic subjected plaintiffs to restraint and physical violence in detention and was complicit in plaintiffs' ongoing arbitrary detention. *See Hampton v. Norred & Assocs.*, 216 Ga.App. 367, 454 S.E.2d 222, 223–24 (1995). Therefore, Vuckovic is liable to plaintiffs under Georgia law for false imprisonment.

### C. *Intentional Infliction of Emotional Distress*

 The defendant is liable for intentional infliction of emotional distress if he engaged in conduct that (1) was intentional or reckless, (2) extreme and outrageous, and (3) had a causal connection to plaintiffs' emotional distress that was (4) severe. *See Hendrix v. Phillips*, 207 Ga. App. 394, 428 S.E.2d 91, 92–93 (1993). Defendant Vuckovic intentionally harmed and humiliated the plaintiffs. The extreme and outrageous nature of the defendant's actions, which are, in fact, violations of the law of nations, are "intolerable in a civi-

---

**67.** Plaintiffs presented extensive information on the laws of Bosnia–Herzegovina, which demonstrates that there is no conflict between the laws of Bosnia–Herzegovina and the laws of the State of Georgia as to these municipal law claims. Therefore, the Court has not separately considered the laws of Bosnia–Herzegovina.

lized community" as required under Georgia law. *Phinazee v. Interstate Nationalease, Inc.,* 237 Ga.App. 39, 514 S.E.2d 843, 844–45 (1999). Furthermore, the plaintiffs suffered severe mental anguish as a direct result of the defendant's actions. Defendant Vuckovic's conduct thus meets all of the requisite elements for imposing liability for intentional infliction of emotional distress.

### D. *Conspiracy*

 Georgia law allows plaintiffs to recover for civil conspiracy, defined as a combination between two or more persons to do some unlawful act which is a tort or else to do some lawful act by methods which constitute a tort. *Cook v. Robinson,* 216 Ga. 328, 116 S.E.2d 742, 744–45 (1960). As described herein, Vuckovic acted together with other guards and soldiers to detain, torture, and abuse plaintiffs and may be held liable for acts perpetrated by others pursuant to their common design. *Id.* at 745–46.

### X. *Damages*

 In light of defendant's egregious conduct detailed above, plaintiffs are entitled to an award of damages as compensation for their injuries and suffering and to punish defendant and deter others from committing similar abuses. It is well-established that victims of human rights abuses actionable under the ATCA and the TVPA may recover both compensatory and punitive damages. *See, e.g., Hilao,* 103 F.3d at 779–82; *Xuncax,* 886 F.Supp. at 197–202; *Filartiga,* 577 F.Supp. at 862–63. As the Eleventh Circuit has noted, the ATCA establishes a federal forum where courts may "fashion domestic common law remedies to give effect to violations of customary international law." *Abebe–Jira,* 72 F.3d at 848.

### A. *Compensatory Damages*

Courts have awarded substantial compensatory damage awards to plaintiffs in ATCA and related cases in light of the gravity of the abuses involved and the serious physical and psychological injuries caused by acts such as those suffered by plaintiffs in this case. *See, e.g., id.* at 846–48 (affirming award of $200,000 in compensatory damages to each of three plaintiffs for torture and cruel, inhuman, or degrading treatment); *Hilao,* 103 F.3d at 779–82 (affirming class award of $767.5 million in compensatory damages for torture, summary execution, and disappearances); *Avril,* 901 F.Supp. at 335–36 (awarding from $2.5—$3.5 million in compensatory damages to each of six plaintiffs for arbitrary detention, torture, and cruel, inhuman or degrading treatment); *Xuncax,* 886 F.Supp. at 197–98 (awarding from $500,-000—$3 million in compensatory damages to each plaintiff for summary execution, torture, arbitrary detention, and/or cruel, inhuman and degrading treatment); *Filartiga,* 577 F.Supp. at 864–67 (awarding $175,000 and $200,000 in compensatory damages, respectively to plaintiffs for extrajudicial killing of son and brother).

 These decisions reflect the international law of damages, which recognizes that victims of violations of international norms are entitled to compensation for all harm proximately caused by a defendant's wrongful acts. "It is a principle of international law ... that every violation of an international obligation which results in harm creates a duty to make adequate reparation." [68] Such reparation must, to the extent possible, "wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been

---

68. *Velasquez Rodriguez,* Inter–Am. C.H.R., 11 H.R.L.J. 127, ¶ 25 (1989) (awarding the

family of a "disappeared" person damages for loss of earnings and psychological injuries).

committed."[69] Under international law, individuals are entitled to damages for a broad range of physical, emotional, and social harms:

> That one injured is, under the rules of international law, entitled to be compensated for an injury inflicted resulting in mental suffering, injury to his feelings, humiliation, shame, degradation, loss of social position or injury to his credit or to his reputation, there can be no doubt, and such compensation should be commensurate to the injury.[70]

Plaintiffs also are entitled to compensatory damages on each of their municipal tort law claims. *See Wal–Mart Stores, Inc. v. Johnson,* 249 Ga.App. 84, 547 S.E.2d 320, 324 (2001).

██ As described in the findings above, each plaintiff has presented compelling testimony of the extreme physical and emotional pain and suffering each endured as a result of torture and other inhumane acts perpetrated by defendant Vuckovic. Vuckovic's acts contributed to the daily and nightly fear each felt that they could be tortured or killed at any time during their detention. By his complicity in plaintiffs' unlawful detention, Vuckovic also contributed to plaintiffs' misery caused by their unlawful detention in a hellish world of daily torture, humiliation, and deprivation, separated from spouses, children, and family.

Plaintiff Subasic described the distinct suffering he and other detainees endured as a result of their prolonged captivity. He identified as one of the most painful aspects of his ordeal the inability to visit with his wife and newborn child because of his captivity, and becoming a stranger to his own daughter through his long absence.

Plaintiffs continue to suffer from their ordeals both physically and emotionally. As described above, all have lasting physical scars and injuries, and continue to experience pain from the injuries they suffered as a result of torture. All but one have found it impossible to return to work. Even plaintiff Subasic, presently employed, has occasionally found it necessary to leave work after becoming distressed when reminded of his ordeal by some incident. All suffer in various combinations and degrees from nightmares, difficulty sleeping, flashbacks, anxiety, difficulty relating to others, and feeling abnormal.

Vuckovic's actions were a substantial and proximate cause and contributing factor in the past and ongoing injuries, pain, and suffering experienced by plaintiffs, and they justify a substantial award of compensatory damages commensurate with awards for similar conduct in other cases. Accordingly, the Court awards plaintiffs compensatory damages as follows:

| | | |
|---|---|---|
| a) | Kemal Mehinovic: | $10,000,000 |
| b) | Muhamed Bicic: | $10,000,000 |
| c) | Safet Hadzialijagic: | $10,000,000 |
| d) | Hasan Subasic: | $10,000,000 |

### B. *Punitive Damages*

Punitive damages are an appropriate, if not essential, mechanism for upholding prohibitions against human rights abuses reviled by the international community. As the court noted in *Filartiga:* "[T]he objective of the international law making torture punishable as a crime can only be vindicated by imposing punitive damages." 577 F.Supp. at 864.

Numerous courts have found substantial punitive damage awards justified against defendants found to have violated customary international human rights norms. *See, e.g., Abebe–Jira,* 72 F.3d at 846–48

---

**69.** *Concerning the Chorzow Factory* (F.R.G.v.Pol.), 1928 P.C.I.J. (Ser.A) No. 17, at 47.

**70.** M. Whiteman, DAMAGES IN INTERNATIONAL LAW, 718–19 (1943).

(affirming punitive damages award of $300,000 to each of three plaintiffs for torture and cruel, inhuman, or degrading treatment); *Hilao*, 103 F.3d at 779–82 (affirming class award of $1.2 billion in exemplary damages for torture, summary execution, and disappearances); *Avril*, 901 F.Supp. at 335–36 (awarding $4 million to each of six plaintiffs for arbitrary detention, torture, and cruel, inhuman or degrading treatment); *Xuncax*, 886 F.Supp. at 197–98 (awarding punitive damages of $500,000—$5 million for summary execution, torture, arbitrary detention, and cruel, inhuman and degrading treatment); *Filartiga*, 577 F.Supp. at 864–67 (awarding $5 million in punitive damages to each of two relatives of victim of torture and extrajudicial killing).

■ Punitive damages are designed both to punish and to teach a defendant, and to deter others from committing the same abuses. *Filartiga*, 577 F.Supp. at 866. To accomplish that purpose, courts "must make clear the depth of the international revulsion against torture and measure the award in accordance with the enormity of the offense." *Id.* The Supreme Court has noted that evidence of repeated misconduct is relevant in determining an appropriate punitive damage award:

> Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law .... Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.

*BMW of North America Inc. v. Gore*, 517 U.S. 559, 576–77, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (citation omitted).

■ As discussed above, defendant repeatedly tortured and humiliated each plaintiff on a variety of different occasions and committed these abuses in furtherance of a deliberate campaign to destroy, terrorize, and displace the Muslim population of large sections of Bosnia. These abuses were carried out wantonly and maliciously and violated the most fundamental international norms of human rights. Accordingly, the Court finds that an award of substantial punitive damages in the following amounts is appropriate in this case.

| | | |
|---|---|---|
| a) | Kemal Mehinovic: | $10,000,000 |
| b) | Muhamed Bicic: | $10,000,000 |
| c) | Safet Hadzialijagic: | $10,000,000 |
| d) | Hasan Subasic: | $10,000,000 |

## XI. *Conclusion*

Based on the foregoing findings of fact and conclusions of law, the Court DIRECTS the Clerk to enter final judgment in favor of plaintiffs and against defendant in the following amounts:

| | | Compensatory Damages | Punitive Damages |
|---|---|---|---|
| a) | Kemal Mehinovic: | $10,000,000 | $25,000,000 |
| b) | Muhamed Bicic: | $10,000,000 | $25,000,000 |
| c) | Safet Hadzialijagic: | $10,000,000 | $25,000,000 |
| d) | Hasan Subasic: | $10,000,000 | $25,000,000 |